9

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| *LEONEL TORRES HERRERA,* | § | |
| Petitioner | § | |
| | § | |
| vs. | § | Civil Action No. $M - 92 - 030$ |
| | § | |
| *JAMES A. COLLINS, DIRECTOR* | § | |
| *TEXAS DEPARTMENT OF CRIMINAL* | § | |
| *JUSTICE, INSTITUTIONAL DIVISION,* | § | |
| Respondent | § | |

**RESPONDENT'S OPPOSITION TO REQUEST FOR STAY OF EXECUTION, MOTION TO DISMISS PURSUANT TO RULE 9(b), AND, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF**

TO THE HONORABLE JUDGE OF SAID COURT;

NOW COMES James A. Collins, Director, Texas Department of Criminal Justice -- Institutional Division, hereinafter "Collins," by and through the Attorney General of Texas, and files this Opposition to Request for Stay of Execution, Motion to Dismiss Pursuant to Rule 9(b), and, Alternatively, Motion for Summary Judgment and Brief in Support.  In support thereof, Collins would show the Court the following:

**I.**

**JURISDICTION**

This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. §§ 2241, 2254.

## II.

## DENIAL

Collins denies each and every allegation of fact made by Petitioner, hereinafter "Herrera," except those supported by the record and those specifically admitted herein.

## III.

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition Below

Collins has lawful custody of Herrera on the basis of a judgment and sentence of the 197th District Court of Cameron County, Texas, in Cause No. 81-CR-672-C. By an indictment filed on October 14, 1981, Herrera was charged with the capital murder of Enrique Carrisalez, a peace officer acting in the lawful discharge of an official duty. TEX. PENAL CODE ANN. § 19.03(a)(1). Trial on the merits commenced on January 13, 1982, and the jury found Herrera guilty as charged in the indictment on January 20, 1982. On January 21, 1982, following the presentation of additional evidence relating to punishment, the jury affirmatively answered the two special issues submitted to it pursuant to TEX. CODE CRIM PROC. ANN. art. 37.071 (Vernon Supp. 1991). Thereafter, in accordance with Texas procedure, the trial court assessed Herrera's punishment at death.

Herrera's conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals, which affirmed on October 31, 1984. Rehearing was denied on January 16, 1985. *Herrera v. State,* 682 S.W.2d 313 (Tex. Crim. App. 1984). The United States Supreme Court refused certiorari review on May 28, 1985, *Herrera v. Texas,* 471 U.S. 1131, 105 S.Ct. 2665 (1985).

On July 2, 1985, the state trial court issued a warrant ordering that Herrera be executed by lethal injection before sunrise on August 16, 1985. Herrera filed an application for a writ of habeas corpus pursuant to Texas Code of Criminal

2

Procedure 11.07 (Vernon Supp. 1991) in the convicting court, which recommended that relief be denied. On August 2, 1985, the Texas Court of Criminal Appeals denied relief. *Ex parte Herrera*, Application No. 12,848-02 (Tex. Crim. App. 1985).

On August 7, 1985, Herrera filed a federal petition for habeas corpus and a motion for stay of execution in this Court. Respondent did not oppose the motion, and the Court entered a stay on August 12, 1985. In its Second Amended Memorandum on October 23, 1989, the Court concluded that Herrera had failed to make a showing of a denial of a federal constitutional right as required under 28 U.S.C. § 2254, denied Herrera's federal habeas corpus petition, and dissolved the stay of execution. *Herrera v. McCotter*, No. B-85-343 (S.D. Tex. 1989).

Herrera appealed the district court's judgment. On October 30, 1989, the district court granted a certificate of probable cause for appeal to the United States Court of Appeals for the Fifth Circuit. On June 25, 1990, the Fifth Circuit affirmed the judgment and vacated Herrera's stay of execution. *Herrera v. Collins*, 904 F.2d 944 (5th Cir. 1990). Herrera's application for certiorari review in the United States Supreme Court was denied on October 15, 1990. *Herrera v. Collins*, ___ U.S. ___, 111 S.Ct. 307 (1990).

On October 30, 1990, the trial court issued a warrant setting Herrera's execution date for December 17, 1990. Herrera filed an application for a second state writ of habeas corpus and motion for stay of execution on December 12, 1990. The following day, the trial court modified Herrera's execution date to January 23, 1991. On January 2, 1991, the trial court recommended that the relief requested be denied. On January 14, 1991, the trial court withdrew its January 2 order, entered Findings of Facts and Conclusions of Law, and denied relief. On January 17, 1991, the Texas Court of Criminal Appeals ordered the cause filed and set argument on Herrera's allegation that the Texas capital sentencing scheme did not allow the presentation or consideration of constitutionally mitigating evidence. The Court of

3

Criminal Appeals denied relief on May 29, 1991, on the basis of the trial court's findings and conclusions and vacated the stay of execution. *Ex parte Herrera*, No. 71,171 (Tex. Crim. App. 1991).[1]  Herrera sought rehearing. On May 31, 1991, the trial court issued an order directing that Herrera's execution be carried out on August 22, 1991.  Because a decision on rehearing was pending and the mandate had not yet issued, the Court of Criminal Appeals granted Herrera's motion to vacate the execution.  On September 18, 1991, the Court of Criminal Appeals denied rehearing, but the issuance of mandate was stayed until December 17, 1991.

Following the issuance of mandate from the Court of Criminal Appeals, the trial court scheduled Herrera's execution for February 19, 1991.  On December 17, 1991, Herrera filed a petition for writ of certiorari in the United States Supreme Court.  The petition is still pending before that Court.

Prior to filing a petition for habeas corpus in this Court, Herrera filed a motion for appointment of counsel, for *ex parte* hearing for experts and investigators, and for stay of exectuion in this Court on February 13, 1992.  This motion was denied the following day.  Herrera filed the instant application for a federal writ of habeas corpus on the morning of February 16, 1992.

## B. Statement of Facts

The facts relating to Herrera's commission of capital murder are set forth in the opinion of the United States Court of Appeals for the Fifth Circuit.

> On the evening of September 29, 1981, at approximately 10:40 p.m., the body of Texas Department of Public Safety Officer David Rucker was discovered 6.2 miles east of Los Fresnos, Texas.  Rucker was killed by a

---

[1]  The Court of Criminal Appeals adopted all findings of fact of the trial court but declined to adopt the trial court's legal finding of procedural default with respect to Herrera's claim that the jury could not give effect to the punishment phase evidence that was presented at his trial.

gunshot wound to the head. There were no witnesses to the shooting. Herrera's social security card, however, was discovered near the body. Ten minutes later, Los Fresnos police officer Enrique Carrisalez stopped a speeder traveling west on the road from where Rucker's body was found. Carrisalez parked on the shoulder with his headlights illuminating the driver's side of the speeding car. Carrisalez radioed the driver's license plate number to the dispatcher.

As Carrisalez approached the car which had been stopped, the driver of that car stepped toward Carrisalez and fired one or more shots. Carrisalez was shot in the chest. He died nine days later from the wound.

Civilian Enrique Hernandez was accompanying Carrisalez on the night of the shooting. Hernandez witnessed the shots fired on Carrisalez, and immediately took cover on the seat of the patrol car. When Hernandez looked over the dashboard again, he saw Carrisalez fire four shots as the car which had been stopped sped away. Hernandez radioed in a description of the suspect's automobile. Almost immediately afterwards, Hernandez was interviewed by police officers. A few hours later, on the morning of September 30, Hernandez gave a statement to Texas Ranger Bruce Casteel. The police then proceeded to obtain an arrest warrant for the as yet unidentified suspect.

Also on the morning of September 30, Hernandez was called to the Harlingen police station and shown a display of six photographs. Hernandez picked out three photographs and said that any one of them could have been the killer; a photograph of Herrera was among those selected.

The next afternoon, two officers went to the hospital room of Officer Carrisalez. The officers showed Carrisalez one photograph of Herrera and asked Carrisalez three times if he could identify it. Although

> Carrisalez was unable to speak, he nodded his head,
> thereby identifying Herrera as the assailant. Later in the
> day, Hernandez was shown the same photograph. He too
> positively identified Herrera as the gunman. The
> photograph was a mug shot that carried the notation
> "Edinburg Police Department."

> On October 4, Herrera was apprehended. Two days
> later, Hernandez picked Herrera's photograph from a
> second photo lineup. The photograph of Herrera used in
> this instance was not the same photograph earlier shown
> to both Carrisalez and Hernandez.

> Finally, on October 24, Hernandez picked Herrera out of
> five person live lineup.

*Herrera v. Collins*, 904 F.2d 944, 945-946 (5th Cir. 1990).

The following additional facts are relevant to Herrera's claim:

### 1. Guilt-Innocence Phase

#### a. State's Evidence

Over the objection of defense counsel, Texas Ranger Bruce Casteel was
directed to read to the jury the following letter, which was authored by Herrera and
introduced as State's Exhibit 76 A - G:

> "To whom it may concern: I am terribly sorry for those I
> have brought grief to their lives. Who knows why? We
> cannot change the future's problems with problems from
> the past. What I did was for a cause and purpose. One
> law runs others, and in the world we live in, that's the way
> it is."

> "I'm not a tormented person. I am sane in every way. My
> military life has nothing to do with this. We are all out
> here to service one way other and other."

> "I believe in the law. What would it be without this men
> that risk their lives for others, and that's what they should

6

be doing -- protecting life, property, and the pursuit of happiness. Sometimes, the law gets too involved with other things that profit them. The most laws that they make for people to break them, in other words, to encourage crime."

"What happened to Rucker was for a certain reason. I knew him as Mike Tatum. He was in my business, and he violated some of its laws and suffered the penalty, like the one you have for me when the time comes."

"My personal life, which has been a conspiracy since my high school days, has nothing to do with what has happened. The other officer that became part of our lives, me and Rucker's (Tatum), that night had not to do in this. He was out to do what he had to do, protect, but that's life. There's a lot of us that wear different faces in lives every day, and that is what causes problems for all." (Unintelligible word).

"You have wrote all you want of my life, but think about yours, also. Signed Leonel Herrera."

"I have tapes and pictures to prove what I have said. I will prove my side if you accept to listen. You (unintelligible word) freedom of speech, even a criminal has that right. I will present myself if this is read. If not, that proves my point. If this is read word for word over the media, I will turn myself in; if not, don't have millions of men out there working just on me while others -- robbers, rapists, or burglars -- are taking advantage of the law's time. Excuse my spelling and writing. It's hard at times like this."

(SR XV 82 - 84).[2]

---

[2]    "SR" refers to the state record of Herrera's trial with the volume designated by Roman numeral and the page by Arabic number. "Tr" refers to the transcript of the trial. "SX" refers to exhibits that were introduced into evidence by the state at trial.

### b. Defense evidence

Defense counsel called six witnesses to the stand: Roger Dale Conaster and Joseph Bailey, both of whom were evidence technicians with the McAllen Police Department, who were questioned about photographs of the car Herrera had been driving and fingerprints that were found on it (SR XVI 3-16, 20-22); Julie Love, a police dispatcher with the Los Fresnos Police Department, who testified about the description of the car that was involved in the shooting of Officer Carrisalez (SR XVI 22-26); Los Fresnos resident Lucille Merriman, who heard gunshots and saw a vehicle leaving town on the night of the incident (SR XVI 31-38); Danny Carter, a latent fingerprint examiner for the Texas Department of Public Safety, who also testified about fingerprints that were found on the vehicle Herrera had been driving (SR XVI 38-46, 58-62); and Enrique Hernandez, the civilian who was riding with the decedent in the patrol car on the night of the murder, who was questioned about an identification he made of the perpetrator from a photo array (SR XVI 47-57).

### c. State's rebuttal

Texas Ranger Bruce Casteel, who apprehended Herrera four days after the commission of the offense, testified in rebuttal about the appearance of Herrera at the time he was arrested and about police investigation with respect to the identification of the vehicle that was involved in the offense (SR XVI 62-65).

### 2. Punishment Phase

#### a. State's Evidence

Edinburg Police Chief Alfredo C. Gonzales and Edinburg police officer Ventura Serda testified that Herrera's reputation as a peaceful and law abiding citizen was bad (SR XVIII 8-12). In addition, Texas Department of Public Safety investigator Joel Young examined the vehicle Herrera was using at the time of the murder and discovered an illegal sawed-off shotgun under the spare tire in the trunk, along with several .12 gauge shotgun shells (SR XVIII 12-22). Further, DPS

Troopers Victor Escalon and Santiago Robles, who were assigned to guard Herrera at Edinburg General Hospital where he was taken from the Edinburg City Jail after his apprehension, related death threats made by Herrera on the officers (SR XVIII 23-29). Steve Robertson, a DPS chemist who took blood and hair samples from Herrera while he was in Edinburg Hospital, confirmed Herrera's death threats to the police officers who were guarding him (SR XVIII 30-32). Maria Guadalupe Aguilar, a nurse who also witnessed Herrera's threats to the peace officers, heard Herrera say "that he could kill the six policemen, one by one, or that he would take them all together if he had to" (SR XVIII 32-34). In addition, KGBT news photographer Gregory Brendan Bader testified that he had been filming Herrera's arrival at the justice of the peace office after his apprehension for an unrelated offense when Herrera broke away from the guards and attacked him (SR XVIII 41-42).

### b. Defense evidence

Joe K. Hendley, First Assistant Criminal District Attorney for Hidalgo County, went to the Edinburg City Jail on October 4, 1981, after Herrera had been arrested, to assist the police (SR XVIII 47-48, 53-54). When Hendley asked Herrera why he killed DPS Trooper Rucker, Herrera struck him, knocking him unconscious (SR XVIII 50-52). DPS Trooper Jose Garza, who witnessed part of Herrera's assault on Hendley, grabbed Herrera from behind, and they both fell to the floor, striking a piece of furniture in the process (SR XVIII 64-65, 68-69, 71-73). Garza was able to handcuff Herrera, and, still handcuffed, Herrera walked to a cell (SR XVIII 65-67, 71, 74-75).

Later in the evening, Herrera was taken to Edinburg General Hospital (SR XVIII 76, 80).[3] According to Dr. Francisco I. Pena, when Herrera arrived at the hospital, he had difficulty breathing, was semi-conscious, and had only limited movement in his arms and lower extremities (SR XVIII 80-81). Herrera also had an internal strabismus,[4] and his pupils had sluggish reflexes to light (SR XVIII 81-84). Although Herrera could have been faking the paralysis, he could not have faked the sluggish pupillary reactions or the internal strabismus (SR XVIII 84, 90). Dr. Pena noticed bruises around the neck and chest area, which were consistent with someone grabbing Herrera from behind to subdue him (SR XVIII 81, 87-89). There was also a bump on the left side of Herrera's head that could have been caused by falling and bumping something (SR XVIII 81, 89). An endotracheal tube was inserted to open Herrera's breathing passage, and intravenous fluids were started as a precautionary measure so that medications could be administered intravenously if required (SR XVIII 81-82). X-rays were taken, and although neither Dr. Pena nor a radiologist nor a neurosurgeon could detect any abnormalities, Herrera was admitted to the hospital for observation overnight (SF XVIII 82-83).

Dr. H.M. Lizcano, for whom Herrera's sister was employed as a secretary, also was called to the Edinburg General Hospital on October 4, 1981, to check on Herrera (SR XVIII 92-93). Lizcano confirmed Dr. Pena's findings that Herrera was unconscious and unresponsive to stimuli, that his eyes were reacting abnormally, that his respiration was shallow, and that he had red marks around his neck and a lump on the side of the head above the left ear (SR XVIII 94). Lizcano did not

---

[3]  Chief Gonzalez of the Edinburg police department testified that an ambulance was summoned for Herrera after his attorney arrived at the jail (SR XVIII 103-105).

[4] An internal strabismus is an involuntary movement of the eye in which the eyeball turns inward (SR XVIII 83-84).

believe that Herrera was faking his symptoms, since it would have been almost impossible for a person to act unconscious while the anesthesiologist was passing the tube down his trachea (SR XVIII 96). Lizcano also confirmed that no injuries were apparent on the Xrays (SR XVIII 95). Within approximately two hours after Dr. Lizcano arrived at the hospital, "everything came back completely" for Herrera, including consciousness, reflexes, and mental alertness (SR XVIII 95). Herrera was released from the hospital the following day (SR XVIII 90).

Stan Clark saw Herrera strike Hendley in the face and assisted in subduing Herrera (SR XVIII 98-99, 102). Although Herrera walked to his cell after he was handcuffed, the officers dragged him from the room where the assault occurred (SR XVIII 100).

Herrera did not introduce testimony from family members, friends, or mental health professionals, or any evidence of alleged drug abuse at either phase of trial.

## IV.

## RECORDS

Copies of the record from Herrera's state trial, appeal, and first state habeas application were filed with the Court in connection with the first federal habeas corpus petition. The records of his second state habeas petition also have been filed with the Court.

## V.

## PETITIONER'S ALLEGATIONS

The state understands Herrera's allegations to be as follows:

1.  The state's failure to reveal exculpatory evidence resulted in the conviction and sentence of an innocent person, in violation of the Sixth, Eighth, and Fourteenth Amendments.

11

2. Herrera was tried by a jury that included a detective from an office that investigated the case, in violation of the Sixth, Eighth, and Fourteenth Amendments.

3. Detective Bressler misrepresented facts during voir dire and wore his gun during Herrera's trial, in violation of the Sixth, Eighth, and Fourteenth Amendments.

4. The Texas capital sentencing statute improperly precluded the jury from considering evidence in mitigation of Herrera's sentence, in violation of the Sixth, Eighth, and Fourteenth Amendments.

5. The trial judge wrongfully refused to allow Herrera to speak during his trial.

## VI.

## EXHAUSTION OF STATE REMEDIES

Herrera has sufficiently exhausted his state remedies as required by 28 U.S.C. § 2254(b) and (c) with respect to the claims as currently posed in his federal habeas application.

## VII.

## MOTION TO DISMISS PURSUANT TO RULE 9(b)

In Herrera's first federal habeas corpus application, filed with this Court on August 7, 1985, he raised the following claims for relief:

1. The in-court identification of Herrera by Enrique Hernandez was tainted by impermissibly suggestive pretrial photographic displays and a suggestive line-up so as to give rise to a substantial likelihood of misidentification, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

2.  The admission of Carrisalez' dying declaration identifying Herrera as his assailant was without the proper predicate, and therefore its admission was in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

3.  The dying declaration was tainted by an impermissibly suggestive identification procedure so as to give rise to a substantial likelihood of misidentification, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

4.  Herrera's statement while he was in the hospital that he would kill several police officers was the "fruit" of an earlier improper attempted custodial interrogation and was improperly admitted into evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

5.  The Texas Court of Criminal Appeals' requirement that an appellant establish by clear and convincing evidence that a complaining witness' identification is irreparably tainted lessens the state's burden of proof in violation of the due process and equal protection clauses of the Fourteenth Amendment;

6.  Herrera received ineffective assistance of counsel at trial.[5]

Thus, none of Herrera's current claims was presented in his first federal petition, filed on August 7, 1985, and decided on October 23, 1989. Each of his current claims could have and should have been included in Herrera's first federal habeas

---

[5] Herrera's direct appeal to the Texas Court of Criminal Appeals raised issues with respect to:  the pretrial and in-court identifications of him as the perpetrator of the offense; the admission of the dying declaration; the admission of the threats Herrera made against the officers while he was in the hospital; and the testimony concerning his assault on a news correspondent. *Herrera v. State*, 682 S.W.2d at 316.

petition. Therefore, Herrera's attempt to litigate them now constitutes an abuse of the writ.

Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Court states in pertinent part:

> A second or successive petition may be dismissed if . . . new or different grounds are alleged, [if] the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

This provision applies to capital murder petitioners under sentence of death. *E.g.,* *Johnson v. Lynaugh,* 821 F.2d 224 (5th Cir.), *stay denied,* 483 U.S. 1013, 107 S.Ct. 3248 (1987); *Berry v. Phelps,* 819 F.2d 511 (5th Cir.), *stay denied,* 482 U.S. 910, 107 S.Ct. 3179 (1987). Indeed, the Supreme Court has explicitly stressed the applicability of this Rule to capital murder petitioners:

> A pattern seems to be developing in capital cases of multiple review in which claims that could have been brought years ago are brought forward -- often in a piecemeal fashion -- only after the execution date is set or becomes imminent. Federal courts should not continue to tolerate -- even in capital cases -- this type of abuse of the writ of habeas corpus.

*Woodard v. Hutchins,* 464 U.S. 377, 380, 104 S.Ct. 752, 753-754 (1984) (Powell, J., joined by Burger, C.J., Blackmun, Rehnquist and O'Connor, JJ., concurring).

The Supreme Court recently characterized the abuse doctrine as a "presumption" against adjudication of claims defaulted in the first round of federal habeas and held that "inexcusable neglect" is the appropriate standard by which to measure the petitioner's conduct. *McCleskey v. Zant,* ___ U.S. ___, ___, 111 S.Ct. 1454, 1468-1470 (1991).[6] The Court further held that, unless review was necessary

---

   [6] In so holding, the Supreme Court approved the general standard that has been applied in this circuit. The Fifth Circuit consistently has held that the standard

to prevent a miscarriage of justice, a federal habeas court should exercise its discretion to entertain such claims only where the petitioner satisfies the "cause and prejudice" standard of *Wainwright v. Sykes,* 433 U.S. 79, 97 S. Ct. 2497 (1977). *McCleskey,* ___ U.S. at ___, 111 S.Ct. at 1470.

In addition, the Supreme Court explicitly instructed lower federal courts about the manner in which the *Sykes* standard should be applied in the context of abuse of the writ:

> The cause and prejudice analysis we have adopted for cases of procedural default applies to an abuse of the writ inquiry in the following manner. When a prisoner files a second or subsequent application, the government bears the burden of pleading abuse of the writ. The government satisfies this burden if, with clarity and particularity, it notes petitioner's prior writ history, identifies the claims that appear for the first time, and alleges that petitioner has abused the writ. The burden to disprove abuse then becomes petitioner's. To excuse his failure to raise the claim earlier, he must show cause for failing to raise it and prejudice therefrom as those concepts have been defined in our procedural default decisions. The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard. If petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim. Application of the cause and prejudice standard in the

---

against which to measure a petitioner's conduct is not whether he intended to bypass an issue at the time of the earlier petition, but "whether he withheld it without legal excuse." *Hamilton v. McCotter,* 772 F.2d 171, 176 (5th Cir. 1985), *quoting Jones v. Estelle,* 722 F.2d 159, 163 (5th Cir. 1983) (*en banc*), *cert.* denied sub nom. *Jones v. McKaskle,* 466 U.S. 976, 104 S. Ct. 2356 (1984).

> abuse of the writ context does not mitigate the force of
> *Teague v. Lane,* [489 U.S. 288, 109 S. Ct. 1060 (1989)],
> which prohibits, with certain exceptions, the retroactive
> application of new law to claims raised in federal
> habeas. Nor does it imply that there is a constitutional
> right to counsel in federal habeas corpus. *See*
> *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990,
> 1993 (1987) ("the right to appointed counsel extends to
> the first appeal of right, and no further")

*McCleskey,* ___ U.S. at ___, 111 S.Ct. at 1470-1471. The Court reaffirmed that "'cause . . . requires a showing of some external impediment **preventing** counsel from constructing or raising a claim.'" *Id.* at ___, 111 S.Ct. at 1472. (emphasis added in *McCleskey*), *quoting Murray v. Carrier,* 477 U.S. 478, 492, 106 S. Ct. 2639, 2648 (1986).

In this second federal petition, Herrera contends for the first time in federal district court that his brother rather than he committed the murders for which he was convicted; that the presence of a detective on his jury resulted from misrepresentations by the detective/juror during voir dire and denied him the right to an impartial jury; that the detective/juror wore gun during jury deliberations; that decisions of the Texas Court of Criminal Appeals chilled the presentation of mitigating evidence in violation of the Eighth Amendment and that, contrary to the Sixth Amendment, state action interfered with the ability of counsel to make independent decisions with respect to the presentation of mitigating evidence; and that the trial court wrongfully refused to allow Herrera to speak during his trial.[7]

---

7 While Herrera's inability to demonstrate cause and prejudice is inherent in his claims, this Court should allow Herrera an opportunity to explain his delay in presenting his current claims. *Urdy v. McCotter,* 862 F.2d 482, 486 (5th Cir. 1988). However, this should not be done by granting a stay of execution. The Fifth Circuit has made clear that the proper procedure the Court should follow is to require Herrera to respond immediately, in writing or orally, to the allegation of writ abuse rather than granting a stay to allow time for the explanation. *Hawkins v. Lynaugh,* 862 F.2d 482, 486 (5th Cir. 1988).

With the exception of Herrera's chilling claim and the claim of actual innocence, the factual basis for these claims, if there be any, derives from the trial record and therefore was known to or knowable by Herrera at the time he filed his first federal petition.    Herrera's claim that the Texas capital sentencing stature improperly precluded the jury from considering additional evidence in mitigation of Herrera's sentence fails as a matter of law.  As in *Cuevas v. Collins,* Herrera's trial attorneys were aware of the factual basis for the claims he now is raising.  932 F.2d 1078, 1081 (5th Cir.), *stay denied,* ___ U.S. ___, 111 S.Ct. 2251 (1991).  In a sworn affidavit, trial counsel in the case has stated that the attorneys knew that Herrera was addicted to controlled substances, they believed that he was under the influence of drugs at the time of the offense, and they knew of the possibility that he was suffering from brain damage (Affidavit of Jose Gomez, Petitioner's Exhibit C).  This information was not presented to the jury, however, because of counsels' judgment that it would have strengthened the prosecution's case, and because it could not have been considered independently as providing a basis for a sentence less than death.  *Id.*  Consequently, this is not a situation in which Herrera's *Penry* claims are based on information that was unavailable at the time of his first federal habeas petition.  Similarly, as to the claim of innocence, Herrera's affiants indicate that his brother allegedly confessed to the crime in 1984, a year before the filing of his first federal petition.  Thus, this information clearly was available at the time of the first federal writ application.  Herrera has not offered, nor can he offer, any sufficient excuse for his failure to discover this "evidence."

Likewise, the legal basis for these claims was known to Herrera at the time he filed his first federal petition.  The legal basis for his claims relating to *Penry* was clearly available at the time of his earlier federal petition.  The Fifth Circuit held in *Cuevas v. Collins* that the legal basis for a *Penry* claim was "available" for writ abuse purposes following the Supreme Court's decision in 1980 in *Lockett v. Ohio,* 438

17

U.S. 586, 98 S.Ct. 2954 (1978), some five years before Herrera filed his first federal habeas petition. 932 F.2d at 1081. Similarly, *Penry* itself forecloses Herrera's argument that the legal basis for these claims was so "novel" as to constitute cause. In *Penry*, the Supreme Court squarely held that the rule Penry sought was not a new rule of constitutional law. 492 U.S. at ___, 109 S. Ct. at 2946-2947. Thus, the rule of *Penry* was not merely "controlled" by or within the "logical compass" of the Court's prior Eighth Amendment precedent. *See Butler v. McKellar,* ___ U.S. ___, ___, 110 S. Ct. 1212, 1217 (1990). Rather, that rule was **dictated** by the Court's earlier decisions in *Lockett v. Ohio* and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869 (1982), and enforced in a particular case the assurances underlying *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950 (1976). *Penry,* 492 U.S. at ___, 109 S. Ct. at 2946-2947; *see also Cuevas v. Collins,* 932 F.2d at 1081 (holding *Penry* claims "available" for writ abuse purposes from decision in *Lockett*), *stay denied,* ___ U.S. ___, 111 S.Ct. 2043. As a matter of law, therefore, Herrera cannot demonstrate "cause" for his failure to raise the claim earlier, and it must be dismissed as an abuse of the writ. *McCleskey v. Zant,* ___ U.S. at ___, 111 S.Ct. at 1470; *see also Moore v. Butler,* 819 F.2d 517, 519 (5th Cir, 1987) (petitioner who is represented by competent counsel is held to possess knowledge of potential grounds for relief that is chargeable to counsel); *Hamilton v. McCotter,* 772 F.2d 171, 176 (5th Cir. 1985).

Herrera also cannot establish "cause" for his failure to raise his *Penry* claims in his first petition by claiming that prior habeas counsel was ineffective. *See Jones v. Estelle,* 722 F.2d 159, 167 (5th Cir. 1983). Such a claim would be unavailing, inasmuch as Herrera cannot show that his previous attorney's representation was constitutionally deficient. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984). In *Coleman v. Thompson,* ___ U.S. ___, 111 S.Ct. 2546, 2566 (1991), the Supreme Court made clear, in a procedural default context, that counsel's actions in a state habeas proceeding would not constitute cause to excuse a procedural default

because the Sixth Amendment does not guarantee counsel in state collateral proceedings. The procedural default rules fully apply in writ abuse contexts, *McCleskey v. Zant,* ___ U.S. at ___, 111 S.Ct. at 1470, and there is no constitutional right to counsel in federal habeas actions.

Further, Herrera's claims do not fall within the fundamental miscarriage of justice exception to the abuse of the writ rules and, thus, do not implicate the question presented in *Sawyer v. Whitley,* ___ U.S. ___, 112 S.Ct. 434 (1991). Where, as here, a federal habeas petitioner's successive claims challenge the constitutionality of his death sentence, the fundamental miscarriage of justice exception to the requirement that a petitioner demonstrate cause and prejudice allows a federal habeas court to grant relief on a successive claim in an "extraordinary" case where (1) a constitutional violation (2) probably resulted in the imposition of a death sentence (3) on one who is actually innocent. *See McCleskey v. Zant,* 499 U.S. at ___, 111 S. Ct. at 1470; *Murray v. Carrier,* 477 U.S. at 496. Herrera cannot avail himself of the fundamental miscarriage exception because, as discussed *infra,* none of his grounds for relief establish a constitutional violation.

In sum, Herrera's claims clearly constitute an abuse of the writ, and Herrera cannot demonstrate an adequate excuse to excuse the abuse. Nonetheless, the Court may wish to address the merits of the claims, particularly in light of the grant of certiorari in *Sawyer* to address the question of actual innocence of a death sentence.

## VIII.

## MOTION TO FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

In the alternative, should the Court find that Herrera's claims do not constitute and abuse of the writ, Collins submits that Herrera is not entitled to habeas relief or a stay of execution for the following reasons.

## A.    HERRERA HAS NOT DEMONSTRATED FACTUAL INNOCENCE.

Herrera suggests that the state failed to reveal certain exculpatory evidence and that, as a result, he was convicted of capital murder even though he was innocent, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. Because Herrera neither identifies any information that was known to the prosecutor at the time of the trial nor demonstrates that he was innocent of the capital murder, this claim is frivolous.

Under *Brady v. Maryland,* "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197 (1963); *Moore v. Illinois,* 408 U.S. 786, 794-795, 92 S.Ct. 2565, 2568 (1972). The discovery of a *Brady* violation does not automatically entitle a defendant to a new trial. *United States v. Nixon,* 881 F.2d 1305, 1308 (5th Cir. 1989). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* at 678, 682, 105 S.Ct. at 3381, 3383; *United States v. Weintraub,* 871 F.2d 1257, 1261 (5th Cir. 1989). The *Brady* decision is subject to harmless error analysis and does not compel reversal when the defense was able adequately to prepare its case. *United States v. Garcia,* 917 F.2d 1370, 1375 (5th Cir. 1990), *citing United States v. Cochran,* 697 F.2d 600, 607 (5th Cir. 1983).

Herrera never identifies the specific evidence that he contends was withheld by the prosecutor. Instead, he cites the Court to five items that are contained in an Appendix: (1) an affidavit from an attorney who represented Raul Herrera, one of Petitioner's brothers, in 1984 -- two years after Petitioner's trial -- to whom Raul

Herrera allegedly confessed to the capital murder; (2) an affidavit from Juan Palacios, who says that in 1984 Raul Herrera said that he and not Petitioner murdered the police officers; (3) newspaper articles from 1989 and 1990 describing drug activity and suggesting that sheriffs in counties other than the one in which Herrera was convicted are suspected of involvement with drugs; (4) an affidavit it which a friend of the Herrera brothers, Jose Ybarra, Jr., says that in 1983 Raul Herrera said that he was the one who killed the two law enforcement officers; and (5) an affidavit prepared in 1992 in which Petitioner's nephew, Raul Herrera, Jr., says that he and a man named Chavello Lopez were in the car when his father (Raul Herrera, Sr.) shot the two police officers.[8]  None of these exhibits demonstrate that the prosecutor knowingly withheld exculpatory information.

The murder of Trooper Rucker and the capital murder of Officer Carrisalez occurred in September of 1981, and Herrera's trial occurred in January of 1982. Nothing in any of the exhibits even remotely suggests that the prosecutor could have been aware of the information contained therein at the time of Herrera's trial. Even if the affidavits are given credence, Raul Herrera did not mention the murders to Jose Ybarra until the summer of 1983, a year and a half after Petitioner's trial, and Raul Herrera's attorney and Juan Palacios were not aware of Raul Herrera's alleged commission of the crime until 1984, two years after the trial.  The earliest date mentioned in any of the newspaper articles with respect to potential police corruption in connection with drug activity in the area is 1985, three years after the

---

[8]  The affidavits of Raul Herrera, Jr., and Jose Ybarra were not presented to the state courts. Since they are, however, merely cumulative of information that was presented to those courts, the Director waives any arguable exhaustion requirement as to these documents. Likewise, the newspaper clippings were not presented to the state courts.  Because the information in those clippings bears no relation to Herrera's conviction, the exhaustion requirement is not implicated with respect to that exhibit.

trial, and there is no indication that officials in Cameron County, where Herrera was convicted, are suspected of any wrongdoing. While Raul Herrera, Jr., asserts that he told a police officer that his father committed the murders rather than petitioner, he does not say that he conveyed this information at a time when it could have been useful to the prosecution. Consequently, there is no indication whatsoever on the face of these exhibits that the prosecutor was aware of any of this information at the time of Herrera's trial in 1982. Moreover, Herrera does not even attempt to show that the prosecution had access to information about police corruption or Raul Herrera's alleged involvement in the offenses at the time of Petitioner's trial. Herrera therefore has failed to meet the threshold requirement of *Brady, i.e.,* that the prosecutor knew of exculpatory information in the first place.

Second, with the exception of the attorney and the newspaper articles, the affidavits have been obtained from relatives and a close friend of Herrera. The attorney and Raul Herrera, Jr., say that Raul Herrera, Sr., was driving Petitioner's car at the time of the murders. Clearly, then, the information that Raul Herrera, Sr., rather than Petitioner, may have committed the offenses was equally available to the defense -- indeed, more readily available to the defense -- as it was to the prosecution. "*Brady* does not oblige the government to provide the defendants with evidence that they could obtain from other sources by exercising reasonable diligence." *United States v. McKenzie,* 768 F.2d 602, 608 (5th Cir. 1985) (citation omitted), *cert. denied,* 474 U.S. 1086, 106 S.Ct. 861 (1986). "When evidence is available equally to the defense and the prosecution, the defendants must bear the responsibility for their failure to diligently seek its discovery." *Id., citing United States v. Milstead,* 671 F.2d 950, 953 (5th Cir. 1982). Herrera's attempt to couch this claim in terms of a *Brady* violation therefore is disingenuous.

Likewise, Herrera has failed utterly to show that the information upon which he is currently relying would have made any difference in the outcome of his trial.

There is no competent evidence before this Court to demonstrate that Raul Herrera or anyone other than Petitioner himself committed the capital murder.

In considering Herrera's state habeas petition, the court found that there was no evidence at trial "remotely suggesting that anyone other than Applicant committed the offense." *Ex parte Herrera*, No. 71,171, Findings of Fact, Claim VIII. The court noted further that the Texas Court of Criminal Appeals found evidence with respect to Herrera's identification as the perpetrator of the offense to be "overwhelming." *Id., citing Herrera v. State*, 682 S.W.2d at 320. Further, the trial court noted that, at a separate trial for the murder of the second officer, Herrera acknowledge in open court that he had committed the capital murder of Officer Carrisalez. *Id.* These factual findings are binding on this Court. *Sumner v. Mata, supra.*

Herrera nonetheless suggests that his brother, Raul Herrera, Sr., confessed to the crime. No affidavit from Raul Herrera himself has been provided to the Court. Instead, Petitioner attempts to prove, through three hearsay affidavits, that someone other than himself confessed to the capital murder some two or more years after he had been convicted of the crime. These hearsay affidavits do not provide competent evidence before this Court. Fed. R. Evid. 804(b)(4),[9],

---

[9] In pertinent part, Rule 804(b)(4), dealing with declarations against interst, states:

> A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Clearly, there are no such corroborating circumstances present in this case. The identification of Herrera by deceased and Hernandez was unequivocal. Hernandez verified that there was only one person, Herrera, in the car, not the three now claimed by Raul Herrera, Jr. Herrrera admitted in writing to committing the two

Consequently, the hearsay affidavits of the attorney, Juan Palacios, and Jose Ybarra cannot be considered by this Court.

Moreover, Herrera provides no explanation why he waited until over eight years after his trial to disclose that Raul Herrera may have committed the offense for which he was convicted. If, as the affidavits indicate, Raul used Petitioner's car to commit the murders, he undoubtedly knew -- or at least suspected -- that Raul was the more likely suspect. There is no indication that he ever suggested this to either the police or his own attorneys, and he has provided no explanation why the evidence with respect to Raul Herrera's involvement could not have been discovered with reasonable diligence at the time of the trial. *See Davis v. Blackburn,* 789 F.2d 350, 352 (5th Cir. 1986). His claim must fail for this reason as well.

Even if this Court were to consider the alleged confessions of Herrera's brother and the affidavit of his nephew, Petitioner is not entitled to federal habeas relief. The affidavits, at most, suggest that Raul Herrera rather than Petitioner committed the murders. "[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759 (1963). Therefore, the confession of another person admitting the crime and exculpating a habeas petitioner does not render the conviction void and subject to collateral attack. *Anderson v. Maggio,* 555 F.2d 447, 451 (5th Cir. 1977). Consequently, the hearsay statements attributed to Raul Herrera and the affidavit of his nephew provide Herrera with no legal basis for relief.

Similarly, the affidavits do not demonstrate that someone other than Petitioner committed the capital murder. Herrera was positively identified as the perpetrator of the capital murder both by an eyewitness to the offense (SR XII 54,

---

interrelated murders. Finally, Herrera's social security card, and not that of his brother, was discovered at the scene of the Rucker murder.

115; XIII 27) and by the victim in a dying declaration (SR XV 161-163). Herrera confessed to the capital murder in a handwritten letter that was in his hip pocket at the time of his arrest (SR XV 45, 83), and later he pled guilty in open court to the concededly interrelated murder of Trooper Rucker (Appendix B, attached to Respondent's Brief in the Texas Court of Criminal Appeals in *Ex parte Herrera*). The hearsay statements of Raul Herrera, Sr., and the affidavit of Raul Herrera, Jr., provide no explanation why Petitioner would have prepared a handwritten confession prior to his arrest if he was innocent, or why he would have been willing to plead guilty to the murder of Trooper Rucker if he believed that someone else had committed the crime. Neither do the affidavits explain the presence of Petitioner's social security card beside Trooper Rucker when his body was found (SR XIII 124, 128). Moreover, Raul Herrera, Jr., says that he witnessed the murders, and that a man named Chavello Lopez was in the car with him at the time both officers were shot. Enrique Hernandez, the eyewitness to the shooting of Officer Carrisalez testified under oath, however, that there was only *one* person in the car at the time Carrisalez was shot, and that person was Leonel Herrera (SR XII 29, 54). There is no challenge in this petition to the accuracy of his observations. In short, Raul Herrera's alleged "confession" is not only incompetent evidence; it is also incredible. Likewise, the affidavit of Raul Herrera, Jr., cannot undermine confidence in the outcome of Herrera's trial.

### B. HERRERA HAS NOT DEMONSTRATED THAT HE WAS PREJUDICED BY THE PRESENCE OF A POLICE DETECTIVE ON HIS JURY.

Herrera also contends that his rights under the Sixth, Eighth, and Fourteenth Amendments were prejudiced by the presence on his jury of Brownsville police detective Joseph Bressler. He concedes that no challenge for cause appears on the

record (Petition at 47 n. 19).[10]  His contention, which is based on speculation and incomplete citations to the record, is procedurally barred and is without merit in any event.

The trial court found that because Herrera had failed to make a contemporaneous objection to the inclusion on his jury of Detective Bressler, he was not entitled to review on the merits of his claims. *Ex parte Herrera*, No. 71,171, Conclusion of Law 2 of Amended Order of 1/14/91.  When a defendant fails to follow a state procedural rule and review of a claim of error is refused by the state courts, federal habeas review of the claim is barred, unless he can demonstrate both cause for his failure and actual prejudice resulting therefrom. *Murray v. Carrier*, 477 U.S. at 494, 106 S.Ct. at 2648.  Herrera fails to demonstrate either cause for his failure to object or resulting prejudice.[11]  Hence, federal review of the merits of this claim is barred.

---

[10]  Herrera "avers" that a challenge for cause was made off the record.  He has, however, provided no documentation whatsoever for this assertion.  It is illogical in the extreme to assume that, if such a challenge for cause had been made off the record, there would have been no reference to it subsequently on the record by the court or defense counsel.

[11]  Herrera attempts to argue that he could not object raise a proper objection beause the trial court would not let him address the court.  Because Herrera could at all times during his trial address the court through counsel, his argument is frivolous.

For a brief time during voir dire in this case, Herrera was placed in an observation room from which he could hear and see the proceedings in the courtroom (SR X 61-67).  This occurred only after Herrera had disrupted the proceedings -- and after he acknowledged that he had done so (SR X 61).  Communications between Herrera and his attorneys were in no way restricted by this action (SR X 61-62).  Herrera was informed that he could return to counsel table as soon as he was willing to conduct himself consistently with courtroom decorum (SR X 62), and he in fact did so (SR X 66-67).  This procedure in no way

Herrera's claim fails even if it is considered on the merits. Great deference must be given to the trial judge who saw and heard the jurors, because the question whether a prospective juror is biased and subject to removal for cause is a question of historical fact. *Wainwright v. Witt,* 469 U.S.412, 428-429, 105 S.Ct. 844, 854-855 (1985). The statutory presumption of correctness established by 28 U.S.C. § 2254(d) is thus applicable to a trial judge's findings of juror bias or the absence of bias. *Id.; Darden v. Wainwright,* 477 U.S. 168, 175, 106 S.Ct. 2462, 2469 (1986); *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892 (1984). The statutory requirement that there be a "determination after a hearing on the merits" is satisfied by a transcript of the voir dire examination. *Wainwright v. Witt,* 469 U.S. at 430, 105 S.Ct. at 855.

In ruling on Herrera's petition for a state writ of habeas corpus, the trial court entered the following findings of fact:

> 10. As to jurors Mike Guajardo, Ashton L. Barefoot, and Daisy May Hanks: Applicant made no challenge for cause, and indeed, raised no objection to their being seated as jurors, R. Vol. IX pp 101, 137 and 156.[12]

> 11. Applicant did not challenge Juror Joseph J. Bressler for cause. He made no objection when the juror was seated, but did ask that he be granted an additional preemptory [sic] challenge (having been granted four additional challenges

---

interfered with the exercise of Herrera's constitutional rights. *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060-1061 (1970).

[12] Herrera implies in his federal petition that jurors Mike Guajardo, Ashton Barefoot, and Daisy Mae Hanks also were somehow objectionable. As the trial court found, however, Herrera never challenged any of these jurors for cause (SR IX 86-101, 123-156). Further, Herrera explicitly accepted Ashton Barefoot on his jury (SR IX 137).

previously) because of the "expressions" and "feelings" of his client. R.Vol. IX 120.

12.   As the indictment was about to be read to the jury, Applicant made his only other mention in trial of jurors Guajardo, Barefoot, Hands and Bressler in an oral motion for mistrial. Referring to the four jurors counsel again made no suggestion they were subject to challenge for cause nor request that they be removed from the jury saying only "the Defendant personally feels that the selection of (the) jurors . . . were wholly unfair and unjust, as far as he was concerned." The motion the sought a mistrial be granted so that Applicant be given "enough time to get an attorney acceptable to him and in whom he has faith and confidence." R.Vol. XII pp 3 and 4.

13.   Petitioner's . . . claim for relief was never urged in the trial Court (except as set out above) and it was not raised on direct appeal or in his subsequent petition for writ of habeas corpus.

*Ex parte Herrera,* No. 71,171, Amended Order of 1/14/91. As the factual recitation below demonstrates, these findings accurately reflect the record in this case. Since state court findings of juror bias -- or the lack of bias -- are dispositive, this claim does not merit federal habeas relief. *Buxton v. Lynaugh,* 879 F.2d 140, 146-147 (5th Cir. 1989), *cert. denied,* ___ U.S. ___, 110 S.Ct. 3295 (1990). *See Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 850 (1983).

The record in the instant case clearly establishes that Detective Bressler was not biased against Herrera. At the outset of voir dire, the following colloquy occurred:

Q.   Do you think that because you are a peace officer and the victim in this case was a peace officer that you could be impartial in this case or

28

do you think it would affect your serving on this
jury?

    A.    "I don't know, sir. I really -- I don't know.

(SR IX 102.)[13] Further questioning clearly demonstrated, however, that Bressler would not be a biased juror. Bressler had not formed any opinion with respect to Herrera's guilt (SR IX 102), and the fact that the victim was a peace officer who was killed in the line of duty would not have an effect on his determination either as to guilt/innocence or punishment (SR IX 102-103, 112). He would not give any more or less credence to the testimony of police officers than he would to other witnesses (SR IX 104). Although Bressler lived in Los Fresnos, he did not know Officer Enrique Carrisalez, the victim in this case, or any other member of the Los Fresnos police department (SR IX 107-108). He also had never met patrolman David Rucker (SR IX 107). Bressler had been exposed to situations in which one witness would tell two different stories, and he had learned to resolve this discrepancy through further investigation (SR IX 110-111).[14] He would not hold it against the defendant that he did not testify (SR IX 111). He would not talk about his personal experiences as a police officer and use them to evaluate the testimony of the witnesses for the other members of the jury (SR IX 113-114). Bressler understood that the state had to prove its case beyond a reasonable doubt, and he believed that was appropriate (SR IX 117). If he honestly believed that Herrera should be found not guilty, or that Herrera should be assessed a punishment of life in prison rather

---

    13  Bressler had been a police officer for three and one-half years (SR IX 106). Prior to that, he was in the Coast Guard for ten years, where he worked enforcement, and he also had been a fireman in Albuquerque, New Mexico (SR IX 106-107).

    14  As the exchange at SR IX 111 demonstrates, contrary to Herrera's assertion (Petition at 43), Bressler did *not* insist that the police ultimately always learn the truth and tell it. Bressler's answers indicate that thorough investigation is likely to produce the truth -- not that the police always know what it is.

than the death penalty, Bressler could have reached that result without being concerned about what other members of the Brownsville police department thought (SR IX 118-119).

At the close of the voir dire of Bressler, Herrera's attorney requested an additional peremptory challenge "[b]ecause of the expressions of my client" (SR IX 119). Trial counsel added, "I can understand his feeling that being accused of two formal indictments of capital murder the impossibility of having a policeman, *even one as apparently sincere as Mr. Bressler is,* that it's important to him" (*id.*).

In denying the request for an additional peremptory challenge, the trial court noted that it had already granted the defense four additional peremptory challenges (SR IX 120).[15] The court added, "Having been both defense counsel and prosecutor and observed the demeanor of this witness, frankly, if I were the State, I'd excuse him, and if I were the defendant, I'd take him" (*id.*).

There is no allegation -- nor could there be, on this record -- that Bressler had been involved in any fashion in the investigation of Herrera's case. As this final exchange makes clear, there apparently was nothing in the demeanor of Detective Bressler that caused either the trial court or defense counsel to doubt the sincerity of Bressler's statements that he could sit on Herrera's jury as a fair and unbiased juror. Thus, there is no basis upon which Herrera now can challenge the validity of these "protestations of impartiality." *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. at 852. *Cf. United States v. Hawkins,* 658 F.2d 279, 285 (5th Cir. 1981) (sufficient inquiry into the possibility of prejudice was made for the court to reach its own independent determination concerning the impartiality of any juror); *United States v. Davis,* 583 F.2d 190, 198 (5th Cir. 1978) (same).

---

15  The loss of a peremptory challenge does not constitute a violation of the constitutional right to an impartial jury. *Ross v. Oklahoma,* 487 U.S. 81, ___, 108 S.Ct. 2273, 2278 (1988).

In addition, Herrera speculates that the presence of Bressler on his jury might have had a negative influence on the other jurors. He has not demonstrated that the other jurors were effected by Bressler's presence on the jury (*see* Section C, *infra*), and there is absolutely no factual basis in the record for this contention.

The gravamen of Herrera's argument really is that the presence of *any* law enforcement officer on his jury, however unbiased that individual was personally, would result in the denial of a fair trial. This argument is untenable. Although certain states may opt to exclude law enforcement officers from service on criminal juries, the federal courts have declined to establish a *per se* rule that excludes from jury service any person who has had an association with an investigatory agency. *United States v. LaRouche,* 896 F.2d 815, 830 (4th Cir.), *cert. denied,* ___ U.S. ___, 110 S.Ct. 2621 (1990), *citing Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940 (1982), *and Dennis v. United States,* 339 U.S. 162, 70 S.Ct. 519 (1950); *United States v. Wilson,* 732 F.2d 404, 410 (5th Cir. 1984); *United States v. Daly,* 716 F.2d 1499, 1507 (9th Cir. 1983), *cert. dismissed,* 104 S.Ct. 1456 (1984); *United States v. Archie,* 656 F.2d 1253, 1259 (8th Cir. 1981), *cert. denied,* 455 U.S. 957, 102 S.Ct. 1455 (1982). *See United States v. Maldonado-Rivera,* 922 F.2d 934, 970-971 (2d Cir. 1990) ("The court is not required to excuse any juror on the basis of his occupational background so long as the court is able to conclude that the juror would be able to view the evidence with impartiality and to decide the case without bias"), *cert. denied,* ___ U.S. ___, 111 S.Ct. 2811 (1991).

In sum, the potential jurors in Herrera's case were meticulously examined for the existence of prejudice, and he has not demonstrated that any of his jurors had an identifiable bias against him. *United States v. Coster,* 646 F.2d 234, 236-237 (5th Cir. 1981). Clearly, then, Herrera has not stated a constitutional claim upon which federal habeas relief may be granted.

## C.   ALLEGEDLY NEWLY DISCOVERED EVIDENCE WITH RESPECT TO DETECTIVE BRESSLER DOES NOT PROVIDE A BASIS FOR A NEW TRIAL.

Relying on a hearsay affidavit, Herrera next contends that he is entitled to a new trial because Detective Bressler allegedly was seen with a gun by another juror during his service on the jury. The trial court found as a fact that "[n]othing at the trial or in its record remotely suggests that [Herrera's] . . . claim has any basis in fact," and that the issue had never been raised in the trial court or on direct appeal. *Ex parte Herrera,* No. 71,171, Findings of Fact, Claim II.  Thereafter, the court concluded that this allegation of juror misconduct was without merit.  *Id.,* Conclysion of Law 3.

The trial court correctly decided this issue.  Herrera's claim is based entirely on the alleged hearsay comments of a juror who refused to sign an affidavit confirming the remarks Herrera now asserts.  The affidavit does not fall within any of the hearsay exceptions of Fed. R. Evid. 803, and consequently it cannot be considered by this Court.

Further, even in the hearsay comments that Herrera has provided, the juror gives no indication that she was influenced in any way by the alleged conversation with Detective Bressler. Assuming *arguendo* that the juror did question Bressler about the gun, the explanation for the situation -- that police officers are required to carry their guns at all times -- was clearly neutral and showed that the detective's wearing of the gun had no connection at all with Herrera's case.  Consequently, even if the reported exchange did occur, Herrera cannot demonstrate that he was prejudiced in any way by it.

Moreover, the Constitution "'does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically

affect their vote.'" *Rushen v. Spain,* 464 U.S. 114, 118, 104 S.Ct. 453, 455 (1983), *quoting Smith v. Phillips,* 455 U.S. 209. 217, 102 S.Ct. 940, 946 (1982). The Court should not readily presume that a juror is biased solely because extraneous information may have reached the juror. *Willie v. Maggio,* 737 F.2d 1372, 1379 (5th Cir.), *cert. denied,* 469 U.S. 1002, 105 S.Ct. 415 (1984). Thus, even if Detective Bressler was wearing a gun while he served on the jury, Herrera has not demonstrated that he was prejudiced by this situation.

Herrera's assertion that Detective Bressler actually knew the victim of the capital murder fails for similar reasons. Again, the only support for his contention is the hearsay remark of a juror who refused even to provide an affidavit to confirm the statement. This hearsay affidavit does not fall within any of the exceptions to Rule 803 of the Federal Rules of Evidence. Consequently, it does not constitute competent evidence in this Court. Herrera therefore has provided nothing to contradict Bressler's sworn testimony during voir dire that he did not know the victim (SR 107-108).

> **D.**    **THE JURY WAS ABLE TO CONSIDER AND GIVE EFFECT TO THE MITIGATING VALUE OF HERRERA'S EVIDENCE IN RESPONDING TO THE PUNISHMENT PHASE ISSUES, AND HIS ASSERTION THAT THE TEXAS CAPITAL SENTENCING STATUTE PRECLUDED PRESENTATION AND JURY CONSIDERATION OF ADDITIONAL MITIGATING EVIDENCE DOES NOT STATE A BASIS FOR FEDERAL HABEAS RELIEF.**

> **1.**    **The jury was able to consider and give effect to the mitigating value of Herrera's evidence in responding to the punishment phase issues.**

Relying on *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320 (1988), and *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934 (1989), Herrera attacks both the

constitutionality of the Texas capital sentencing statute and the constitutionality of the jury instructions in his case. Specifically, he alleges that the Texas capital sentencing procedures and the instructions in his case violated the Eighth and Fourteenth Amendments because they did not allow the jury adequately to consider and give effect to proffered mitigating evidence.

For the first time in his second federal habeas petition, Herrera suggests that his jury was unable to give full consideration to evidence that was introduced at trial with respect to his military service, his voluntary confession that he had some knowledge of the offenses, the mental instability that allegedly was evident from his letter concerning the offense, and his behavior in the hospital. This claim is meritless.

The jury was instructed at the punishment phase of Herrera's trial in accordance with the Texas capital sentencing statute, which provides for a sentence of death if the state proves beyond a reasonable doubt that the answers to the following punishment phase issues should be "yes:"

(1)    whether the conduct of defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; [and]

(2)    whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

(TR. 54-55); TEX. CRIM PROC. ANN. § 37.071 (b) (Vernon Supp. 1991). There was no constitutional infirmity in the instructions because the jury could give effect to the mitigating value of Herrera's proffered evidence in responding to the punishment issues.

In *Penry v. Lynaugh,* the Supreme Court held that where a capital defendant introduces evidence about his background or character, or the circumstances of the

34

offense, that reflects a reduced personal culpability, and the jury cannot give effect to the mitigating force of that evidence in responding to the statutory punishment phase issues, the trial court must, upon request, provide instructions which allow the jury to consider and give mitigating effect to such evidence. 492 U.S. at 319-328, 109 S.Ct. at 2947-2952. *"Penry* does not invalidate the Texas statutory scheme, and [] *Jurek [v. Texas,* 428 U.S. 262, 96 S.Ct. 2950 (1976),] continues to apply, in instances where no major mitigating thrust of the evidence is substantially beyond the scope of the special issues." *Graham v. Collins,* ___ F.2d ___, ___, No. 99-2168, West slip op. 1998, 2019 (5th Cir. January 3, 1992) (en banc).

A capital defendant is entitled to an individualized sentencing decision that is a reasoned moral response to the evidence, including mitigating evidence. *Penry v. Lynaugh,* 492 U.S. at ___, 109 S.Ct. at 2947. It is the traditional and long-standing policies and interests that underlie the practice of individualized sentencing -- society's very justifications for punishing criminals -- that rationalize sentencing and render the jury's response a reasoned and moral one. In *Lockett v. Ohio,* 438 U.S. at 604-605, 98 S.Ct. at 2965, the Supreme Court relied heavily on *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079 (1949), to hold that the policy considerations that led to a prevailing practice of individualized sentencing in non-capital cases attain sufficient weight in capital cases that individualized sentencing is constitutionally indispensable. In capital cases, as in the non-capital context, individualized sentencing serves society's interests by punishing the criminal for his misdeeds (retribution), preventing similar future conduct by the person convicted and others (deterrence), and restoring the convicted person to a useful and productive place in society (rehabilitation). *See Gregg v. Georgia,* 428 U.S. 153, 183-187, 96 S.Ct. 2909, 2929-2931 (1976) (opinion of Stewart, J., joined by Powell and Stevens, JJ.).

Two specific sentencing considerations, a capital defendant's personal culpability and his potential for rehabilitation, have evolved from, and reflect, these

traditional sentencing concerns in the capital context. Consequently, the Supreme Court has found evidence to be constitutionally mitigating when it is relevant to these concerns. Requiring consideration of mitigating evidence to be limited and guided by its relevance to personal culpability and potential for rehabilitation thus renders the jury's verdict a reasoned moral response to the proffered mitigating evidence.

The absence of future dangerousness is constitutionally relevant because it relates to the traditional sentencing consideration of rehabilitation. "Consideration of a defendant's past conduct as indicative of future behavior is an inevitable and not undesirable element of capital sentencing. . . . " *Skipper v. South Carolina,* 476 U.S. 1, 5, 106 S.Ct. 1669, 1671 (1986); *see also Barefoot v. Estelle,* 463 U.S. 880, 897, 103 S.Ct. 3383, 3396-3397 (1983); *California v. Ramos,* 463 U.S. 992, 1002-1003, 103 S.Ct. 3446, 3454 (1983).

Similarly, the sentencer must be permitted to consider the defendant's personal culpability because society's interest in exacting retribution for criminal conduct is, in part, a function of his level of culpability for engaging in that conduct. *Tison v. Arizona,* 481 U.S. 137, 149, 107 S.Ct. 1676, 1683 (1987) (heart of the retribution rationale is that sentence must be directly related to the personal culpability of the offender). *See also Penry v. Lynaugh,* 492 U.S. at 319, 109 S.Ct. at 2947 (underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to personal culpability of defendant); *Franklin v. Lynaugh,* 487 U.S. at 184, 108 S.Ct. at 2332 (O'Connor, J., concurring) (same); *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 834, 841 (1987) (O'Connor, J., concurring) (same).

Further, character or background evidence attains constitutionally mitigating value relevant to a defendant's culpability only if the crime is attributable to the proffered evidence. *Graham v. Collins,* ___ F.2d at ___, West slip op. at 2024, 2027.

> "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are <u>attributable</u> to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. . . . Thus, the sentence imposed at the penalty stage should reflect a reasoned <u>moral</u> response to the defendant's background, character, and crime rather than mere sympathy or emotion.

*Franklin v. Lynaugh,* 487 U.S. at 184, 108 S.Ct. at 2333 (O'Connor, J., concurring), *citing California v. Brown,* 479 U.S. at 545, 107 S.Ct. at 841 (O'Connor, J., concurring) (first emphasis added) (second emphasis in *Brown*); *see also Penry v. Lynaugh,* 492 U.S. at 319, 109 S.Ct. at 2947.  Absent a nexus between the mitigating aspects of the defendant's character or background and the crime itself, the evidence cannot reflect that he is less morally culpable than any other citizen.

Moreover, while a capital sentencing procedure must allow the sentencer to reflect its reasoned moral response to mitigating evidence in determining the appropriate sentence, the Constitution does not require that the sentencer be permitted to dispense mercy based on sympathy for the defendant, even if that sympathy is a response to the mitigating evidence.  "It is no doubt constitutionally permissible, *if not constitutionally required,* for the State to insist that 'the individualized assessment of the appropriateness of the death penalty be a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'"  *Saffle v. Parks,* 494 U.S. 484, ___, 110 S. Ct. 1257, 1262 (1990) (emphasis added), *quoting California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841 (1987).  Thus, while a defendant is entitled to proffer any aspect of his character or background or the circumstance of the offense in mitigation of a death sentence, the Eighth Amendment is violated only if evidence that is probative of a reduced

personal culpability or capacity for rehabilitation cannot result in a sentence less than death.

Finally, a death sentence should not be set aside unless there is a "reasonable probability" that the jury would have interpreted instructions to preclude effective consideration of the mitigating force of the defendant's evidence, as that evidence actually was presented at trial. *Boyde v. California,* 494 U.S. 370, ___ & n.5, 110 S.Ct. 1190, 1198-1199 & n5 (1990); *see also Graham v. Collins,* ___ F.2d at ___, West slip op. at 2025 (defendant cannot claim statutory issues were inadequate if there is nothing to suggest that defense counsel desired to have the mitigating force of youth presented or considered in any other manner than as a basis for a negative answer to the statutory issues). Further, if the jury is able to consider and give effect to the mitigating force of the proffered evidence within the context of one of the statutory inquiries, the failure to provide additional instructions or vehicles by which the jury can consider and give effect to that evidence does not violate the Eighth Amendment. The Constitution does not require that the sentencer be permitted to give effect to the evidence in whatever manner or to whatever extent the defendant desires.[16]  *Graham v. Collins,* ___ F.2d at ___, West slip op. at 1998, 2025 n.27 (where major mitigating thrust of evidence is encompassed by the inquiries of statutory punishment issues, ability to identify mitigating relevance beyond the scope of the statutory issues does not require the submission of an additional issue

---

[16]  In *Saffle v. Parks,* 494 U.S. at ___,. 110 S. Ct. at 1261, the Supreme Court noted that, while the holdings of *Eddings* and *Lockett* govern what factors the jury must be permitted to consider in making its sentencing decision, the Court has never promulgated "rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision." "States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Boyde v. California,* 494 U.S. at ___, 110 S.Ct. at 1196, *citing Franklin v. Lynaugh,* 487 U.S. at 181, 108 S.Ct. at 2331 (plurality opinion).

or instruction allowing the jury to give the evidence further mitigating effect). Rather, the defendant is entitled only to a fair vehicle by which the sentencer can give effect to the mitigating force of his evidence. *See Boyde v. California,* 494 U.S. at ___ n.5, 110 S.Ct. at 1199 n.5; *Saffle v. Parks,* 494 U.S. at ___, 110 S.Ct. at 1261.

Penry proffered evidence that, because he was mentally retarded, he was generally less able than a normal adult to control his impulses or to evaluate the consequences of his conduct; yet because of the irreversible nature of his mental retardation, he, through no fault of his own, could never learn from his mistakes. Thus, Penry's evidence was relevant to the first special issue, namely, whether he acted deliberately. The Court recognized, however, that while Penry's evidence was relevant to whether he acted deliberately, it also had relevance to his moral culpability beyond the scope of the issues. *Penry v. Lynaugh,* 492 U.S. at 322-324, 109 S. Ct. at 2949. Because evidence of an inability to control impulses directly relates to the capacity for deliberate behavior, it clearly was Penry's inability to learn from experience that exceeded the scope of the first issue.

In contrast, Herrera presented no trial evidence that would indicate a general inability to evaluate the consequences of his conduct and formulate alternative behaviors, *i.e.,* to learn from his mistakes. Instead, Herrera attempted through his witnesses at the punishment phase to rebut the prosecution's evidence that he presented a future danger to society. At best, the evidence was presented solely to show that he would not present a future danger, and the jury was able to consider this evidence within the framework of the second special issue.[17]

---

[17] The letter in which Herrera confessed to the crime was presented by the prosecution, and there is no indication that trial counsel for Herrera ascribed any mitigating value to it. The evidence of his altercation with authorities and subsequent hospitalization was introduced to "soften" the effect of his death threats while in the hospital.

The Eighth Amendment does not mandate that a jury be able to respond to every manner in which a defendant wishes to characterize his evidence as mitigating, but merely requires that the jury have an adequate vehicle by which the mitigating force of the evidence can result in a sentence less than death.  Herrera's jury clearly had such a vehicle.  The jury's failure to answer either punishment issue "no" reflects only that his evidence did not raise a reasonable doubt as to whether the murder was committed deliberately and whether he would present a future danger.  This claim must be rejected.

> **2.    Herrera's assertion that the Texas capital sentencing statute precluded  presentation and jury consideration of mitigating evidence does not state a basis for habeas review.**

In a related claim, Herrera alleges that the limited scope of the punishment phase issues set forth in the Texas capital sentencing statute precluded counsel from presenting and the jury from giving full consideration to existing mitigating evidence.  According to Herrera, the structure of the Texas capital sentencing scheme therefore violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Federal habeas corpus relief is inappropriate in this case for any one of three reasons: (1) Herrera seeks the benefit of a new rule of constitutional law that may not be announced or applied in this case; (2) he has not stated a claim for which habeas relief may be granted; and (3) the state courts held his claim to be procedurally barred.

a.   The rule Herrera seeks would be "new" under *Teague v. Lane* and cannot be applied retroactively to his case.

The Supreme Court has never intimated, much less held, that the rule of *Lockett* and *Penry* extends to evidence that never was proffered at the time of trial. Indeed, the Fifth Circuit has held that a defendant "cannot claim factors exist in his case which were not covered by the Texas special issues *unless he has offered proof of those factors at trial.*" *Wilkerson v. Collins,* No. 91-2879, slip op. at 12 (5th Cir. Jan. 6, 1992). Likewise, no Supreme Court precedent dictates the conclusion that a defendant is exempt from the two-prong standard of *Strickland* absent attempted action by counsel and any preclusive action attributable to the state. To the contrary, it is well settled that counsel's perception that it would be futile to take certain action is not the type of government interference that may be imputed to the state. *Compare Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1584 (futility), *with Amadeao v. Zant,* ___ U.S. ___, 109 S.Ct. 1771 (1989) (state interference). Accordingly, acceptance of Herrera's argument would require announcing, and retroactively applying to his case, a new rule of constitutional law. As such, review is foreclosed by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060 (1989).

The rule Herrera seeks would not place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish. Hence, the first narrow *Teague* exception is inapplicable. *Penry v. Lynaugh,* 492 U.S. at ___, 109 S. Ct. at 2952-2953. Nor would the rule fall within the second *Teague* exception, reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. *See Saffle v. Parks,* 494 U.S. at ___, 110 S. Ct. at 1258. It would benefit only those defendants who, like Herrera, cannot demonstrate ineffective assistance of counsel under the two-prong *Strickland* standard or identify any state action that precluded the presentation of mitigating evidence. As such, it

cannot be deemed a fundamental or bedrock rule. *See Sawyer v. Smith,* ___ U.S. ___, ___, 110 S. Ct. 2822, 2832 (1990).

Further, the rule would effectively eliminate procedural defaults in the Eighth Amendment context. Although a claim of futility does not constitute cause for failure to comply with state procedural rules, *Engle v. Isaac,* 456 U.S. at 130 & n.36, 102 S. Ct. at 1573 & n.36 (1982), it would, under the new rule proposed by Herrera, constitute the very basis for granting relief. As *Penry* itself shows, criminal defendants who possess substantial mitigating evidence that is relevant to the defendant's personal culpability are particularly likely to utilize available constitutional principles as they resort to the state procedures for preservation of error. The rule Herrera seeks, thus, would provide a marginal increase in constitutional protection only to the criminal defendants least deserving of it.

> **b.    No state action prevented Herrera from developing and presenting mitigating evidence.**

The Texas courts correctly rejected Herrera's attempt to predicate a constitutional claim under *Penry* and *Lockett* on evidence that was not proffered at the time of trial.[18] The structure of the capital sentencing statute is the only "state

---

[18]    Herrera's evidence bears little resemblance to Penry's evidence of retardation and childhood abuse. Herrera suggested for the first time in his state habeas proceeding, nine years after the trial, that he was suffering from neurological impairment and post-traumatic stress syndrome at the time he committed the capital murders. Any asserted impact the evidence might have had was successfully countered by the state. For example, on collateral review Herrera submitted the report of a psychologist who concluded that Herrera's Navy service resulted in post-traumatic stress disorder, which was manifested by "delusional symptoms of hypervigilence, hyperalertness, and nightmares and flashbacks to his time in Vietnam." *See* report of Bradley Fisher at 5, Appendix ___ of Herrera's habeas petition. An affidavit submitted to the state habeas court from his commanding officer, Kenneth Wallace, indicates, however, that while Herrera served in the United States Navy during the Vietnam War, the ship on which he served was never physically in Vietnam or Vietnamese waters; while the ship was involved in actions

interference" alleged by Herrera. He raises this claim even though defense counsel admits in his affidavit that he deliberately withheld allegedly mitigating evidence with respect to Herrera's family background and mental condition and even though counsel never suggested to the trial court that the absence of an instruction on mitigating evidence might cause him to forego the presentation of additional mitigating evidence.[19]    Thus, Herrera faults the trial court for failing to give supplemental instructions regarding mitigating evidence *sua sponte*. The alleged preclusive effect of the statute does not provide a basis for relief under either the Sixth or Eighth Amendments. *May v. Collins,* 948 F.2d 162 (5th Cir. 1991), *cert. denied,* ___ U.S. ___, ___ S.Ct. ___ (January 13, 1992); *May v. Collins,* 904 F.2d 228, 232 (5th Cir. 1990), *cert. denied,* ___ U.S. ___, 111 S.Ct. 770 (1991). Because this claim, in either a Sixth or Eighth Amendment context, is squarely foreclosed by Circuit precedent, Herrera's claim necessarily fails.

---

with approximately seven enemy airplanes, these encounters occurred at a distance of fifty or more miles from Vietnamese waters, and personnel on the ship, such as Herrera, who where not directly involved in the firing of the ship's guns would have been completely unaware of the encounters. *See* Exhibit __. Wallace further noted that Herrera "was the most violent man on the ship." *Id.* Moreover, Herrera himself asserted that his military life had nothing to do with the crime (SX 76 A-G).

Herrera's family members, including Herrera's father, were present during his trial but none testified. Fisher's evaluation of Herrera was based in part on affidavits of Herrera's family members made ten years after the offense. Fisher never credibly established Herrera's asserted "brain damage" and "psychological and psychiatric disorders" at the critical time of the capital murder. In fact, Herrera was deemed competent to enter a guilty plea to the companion murder of Trooper Rucker in 1983. Herrera stated that he was sane and that his murder of Trooper Rucker was a "business" decision. *See* SX 76. After his incarceration, Herrera denied any history of mental problems for him or anyone in his family. *See* Brief in Response to Herrera's application for habeas relief, *Ex parte Herrera,* No. 71,171.

    [19]    Trial counsel raised no objections at all to the punishment phase instructions.

### I.    No    state    action    precluded    the presentation of mitigating evidence.

Herrera's contention ignores precedent in which the Texas Court of Criminal Appeals has repeatedly emphasized that all relevant mitigating evidence -- including evidence of the defendant's background, character, and mental condition -- is admissible at the punishment phase of capital murder trials. *Ex parte Goodman,* 816 S.W. 383, 386 (Tex. Crim. App. 1991); *Anderson v. State,* 701 S.W.2d 868, 873-874 (Tex. Crim. App. 1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239 (1986); *Johnson v. State,* 691 S.W.2d 619, 624 (Tex. Crim. App. 1984) ("*Lockett* indicated clearly that prior record and aspects of the character of the defendant are the type of mitigating factors that should be permitted. Art. 37.071 and case law that has developed under Art. 37.071 demonstrate that exactly those types of mitigating circumstances are admissible."), *cert. denied,* 474 U.S. 865, 106 S.Ct. 184 (1985); *Stewart v. State,* 686 S.W.2d 118, 121 (Tex. Crim. App. 1984), *cert. denied,* 474 U.S. 866, 106 S.Ct. 190 (1985). Indeed, the Court of Criminal Appeals has not hesitated to reverse in cases where the trial court excluded mitigating evidence. *E.g. Burns v. State,* 761 S.W.2d 353 (Tex. Crim. App. 1988); *Cass v. State,* 676 S.W.2d 589 (Tex. Crim. App. 1984). The law of Texas therefore is very different from that of some other states, such as Florida, where state law at certain times explicitly made evidence of nonstatutory mitigating factors inadmissible. *Demps v. Dugger,* 874 F.2d 1385, 1395 (11th Cir. 1989), *cert. denied,* ___ U.S. ___, 110 S.Ct. 1834 (1990).

Moreover, no ruling by the trial court constitutes state action that even arguably might have precluded the presentation of mitigating evidence. Herrera's trial counsel did nothing that called for such a ruling, despite available state procedures by which counsel could have apprised the court of a perceived problem. Under Sections 36.14 and 36.15 of the Texas Code of Criminal Procedure, trial counsel could have requested special instructions or objected to the jury charge.

44

Further, had the trial court denied a special instruction, and had counsel believed that he could not place evidence before the jury absent such an instruction, he could have proffered a bill of exception pursuant to Article 36.20 of the version of the Texas Code of Criminal Procedure that was in effect at the time of Herrera's trial. (That provision was replaced by Tex. R. App. Proc., eff. Sept. 1, 1986.)[20]

In marked contrast to cases such as *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891 (1972), the court in Herrera's case did not prevent counsel from acting on Herrera's behalf, because counsel did not attempt to act. Accordingly, the alleged error is so undetectable that no trial judge, however conscientious, could have avoided it. Thus, even assuming that the Eighth Amendment can be violated if trial counsel refrains from presenting certain mitigating evidence, the very nature of the claim requires that it be raised at the time of the trial. *Cf. Jones v. Butler,* 864 F.2d 348, 368-369 (5th Cir.) (on rehearing) (a federal predicate to review of a claim under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712 (1986), is that the claim be raised at the time the government exercises its peremptory strikes), *cert. denied,* ___ U.S. ___, 109 S.Ct. 2090 (1989).

Herrera's contention that the Texas Court of Criminal Appeals' previous rejection of challenges to the statute constitutes "state action" is contrary to the holdings of *Engle v. Isaac,* 456 U.S. 107, 102 S. Ct. 1584 (1982) (perceived futility of raising an objection or legal argument will not excuse a procedural default even if reasonable counsel would have chosen to forego the objection or argument), and

---

20   The procedure for making a bill of exceptions is very broad, with the purpose of making the record reflect alleged error that otherwise would not be shown. Additionally, a bill of exception may be made during or after the trial, and counsel need only dictate the substance of the proffered bill. Thus, even if the unpresented evidence were dual-edged, a defendant cannot claim that resort to a bill of exception would have provided the state with evidence to use in aggravation of punishment.

*Murray v. Carrier,* 477 U.S. 478, 106 S. Ct. 2639 (1986).[21]   That is, if an alleged perception of futility cannot be attributed to the state in the procedural default context, it should not be attributed to the state in the context of a Sixth or Eighth Amendment claim.

Herrera's characterization of the Eleventh Circuit's resolution of chilling claims in *Aldridge v. Dugger,* 925 F.2d 1320 (11th Cir. 1991), and *Meeks v. Dugger,* 576 So.2d 713 (Fla. 1991), as conflicting with the Fifth Circuit's resolution of such claims is misleading.   At the time of Aldridge's trial, Florida law "clearly took the position that nonstatutory mitigating evidence was irrelevant to the sentencing hearing."   *Allridge v. Dugger,* 925 F.2d at 1329, *citing Hitchcock v. Dugger,* 481 U.S. 393.   In contrast, the "mitigating" evidence identified by Herrera for the first time on collateral review would have been admissible at trial, and no state statute or legal decision proscribed supplemental mitigation instructions.   This distinguishes the legal landscape in Texas from that in Florida, and the Eleventh Circuit cases cited by Herrera do not represent a conflict with the Fifth Circuit.   The Eleventh Circuit has consistently held, as Judge Clark noted in *Demps v. Dugger,* 874 F.2d 1385, 1395 (11th Cir. 1989), *cert. denied,* ___ U.S. ___, 110 S. Ct. 1834 (1990), "Florida law at the time taught that such evidence [of nonstatutory mitigating factors] was inadmissible."

In any event, *Aldridge* undercuts rather than enhances Herrera's claim of a conflict, because the panel reaffirmed that "in the absence of any action by the court which prevented [a federal habeas petitioner] from introducing the nonstatutory evidence," there is no basis for relief.   *Aldridge,* 925 F.2d at 1329.   The appellate

---

21   Because the rule applied in *Penry* was dictated by the Supreme Court's holdings in *Jurek v. Texas, supra, Lockett v. Ohio, supra,* and *Eddings v. Oklahoma, supra,* the basis for an objection or request for special instruction was firmly established at the time of Herrera's 1982 trial.

court then determined that the federal district court was not "clearly erroneous" in finding such preclusive action by the state trial court in Aldridge's case. *Id.*

Likewise, in *Meeks v. Dugger*, 576 So.2d 713 (Fla. 1991), counsel did not develop nonstatutory mitigating evidence because he "felt constrained by the then-prevailing statutory construction," *id.* at 716, which at the time of Meek's trial prohibited consideration of unenumerated, or nonstatutory, mitigating circumstances.[22] There was and is no similar prohibition in Texas. Under Texas' statute, Herrera's "mitigating evidence" would have been admissible if offered at the time of trial. Were its proffer refused, existing procedural safeguards were available in anticipation of such a contingency.

Herrera thus seeks nothing less than the constitutionalization of sandbagging. No state action foreclosed the investigation and presentation of mitigating evidence.

## II.    No state action interfered with the ability of counsel to make independent decisions about how to conduct the defense.

The Sixth Amendment does not provide a basis for relief independent of the ordinary deficient performance and prejudice prongs of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct 2052 (1984). In *Strickland,* the Supreme Court noted in *dicta* that "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Id.* at 686, 104 S.Ct. at 2063. Nonetheless, the defendant must show prejudice unless the "interference" actually prevented counsel from assisting the defendant at a critical state of the proceedings. *United States v. Cronic*, 466 U.S. 648, 659 & n.25, 104 S.Ct. 2039, 2047 & n.25 (1984).

---

[22]In contrast to Herrera's belated attempts to produce evidence to fit within a *Penry* paradigm, prior to his trial Meeks had been a patient in a mental hospital and had received psychotropic medication. *Meeks* at 716.

47

The *Strickland* Court cited four cases involving impermissible state interference: *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330 (1976); *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550 (1975); *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891 (1972); *Ferguson v. Georgia*, 365 U.S. 570, 81 S.Ct. 756 (1961). Two elements are present in each of these cases: (1) trial counsel overtly attempted to act on behalf of the defendant and (2) a ruling of the trial court affirmatively prevented counsel from taking the contemplated action. It is precisely because of such objective factors that the Court characterized this type of impairment as both "easy to identify" and "easy for the government to prevent." *Strickland*, 466 U.S. at , 686, 692, 104 S.Ct. at 2063-2064, 2067.

Both elements are utterly lacking in the claim presented by Herrera. The mere existence of the facially constitutional Texas capital sentencing statute cannot constitute impermissible interference with counsel's ability to provide a defense. The statute neither proscribes supplemental instructions nor limits the scope of admissible mitigating evidence.

In *Murray v. Carrier*, the Court held that, where counsel's performance is not deficient under *Strickland v. Washington*, "the existence of cause for a procedural default must ordinarily turn on whether the petitioner can show that some objective factor external to the defense impeded counsel's ability to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. at ___ . Neither the impediments that can satisfy the cause requirement, *i.e.*, that the factual or legal basis of the claim was not reasonably available to counsel or that there was some affirmative interference by state officials, nor any comparable impediments are present in this case. The circumstances alleged by Herrera, thus, fall far short of the affirmative state interference with counsel's ability to act as an advocate that would amount to a constructive denial of counsel. *See United States v. Cronic*, 466 U.S. at

659 & n.25, 104 S.Ct. at 2047 & n.25 ; *Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. at 2063-2064 (and cases cited therein).

> 3.  **Federal review of Herrera's claim is foreclosed by the independent and adequate state ground of a procedural default.**

Absent a contemporaneous offer of proof or bill of exception detailing what evidence was withheld at trial, state courts will not consider *Penry* claims based on such evidence. *See, e.g., Ex parte Ellis*, No. 71,107, slip op. at 6-7 (Tex. Crim. App. Spence 29, 1991); *Ex parte Goodman*, 816 S.W.2d 383, 386 n.6 (Tex. Crim. App. 1991). Thus, in Herrera's state habeas action, the trial judge found that Herrera's "chilling" claim was procedurally barred because it is based on evidence not presented at trial. *Ex parte Herrera*, No. 71,171, Conclusion of Law 7 of Amended Order of 1/14/91. The Court of Criminal Appeals expressly adopted this finding in denying relief. Herrera has not alleged cause for the failure to comply with state procedures and, as discussed below, he cannot satisfy the actual innocence exception. Consequently, the independent and adequate state ground of procedural default provides a basis for the denial of habeas relief.

Furthermore, Herrera cannot satisfy the fundamental miscarriage of justice exception to the ordinary cause and prejudice standard. This is not an "extraordinary" case where (1) a constitutional violation (2) probably resulted in the imposition of a death sentence (3) on one who is actually innocent. *See McCleskey v. Zant*, ___ U.S. at ___, 111 S. Ct. at 1470. As discussed above, Herrera can demonstrate no constitutional violation and, thus, the question of actual innocence is not material.

Even assuming *arguendo* that Herrera has stated a claim for relief, he is not actually innocent of the death sentence. Herrera has the burden of demonstrating:

49

> based on the evidence proffered plus all record
> evidence, a fair probability that a rational trier of fact
> would have entertained a reasonable doubt as to the
> existence of those facts which are prerequisites under
> state or federal law for the imposition of the death
> penalty.

*Sawyer v. Whitley,* ___ F.2d ___, No. 91-3658, slip op. at 386-387 (5th Cir. Oct. 10, 1991) (footnotes omitted).  That is, after examining all the evidence in the light most favorable to the verdict, there must be a fair probability that the jury would have entertained a reasonable doubt as to those facts that are prerequisites to imposition of a death sentence.  *Id.,* slip op. at 387-388.

Although Texas does not have "aggravating factors," affirmative answers to the special issues must be proven by the prosecution as prerequisites to imposition of the death penalty.  Consequently, Herrera must demonstrate a fair probability that, but for the alleged "chilling" error, a rational jury would have entertained a reasonable doubt as to the deliberateness of the crime and his future dangerousness. Herrera cannot make such a showing because, as a factual matter, the special issues could not have "chilled" counsel from presenting evidence that supported a negative answer to either issue.

### D.   HERRERA'S RIGHT TO SPEAK DURING TRIAL WAS NOT IMPROPERLY CURTAILED.

Herrera also asserts that the trial court improperly curtailed his right to speak during his trial.  This claim is procedurally barred and depends on a gross distortion of the record.[23]

---

[23]  The only federal legal authority cited by Herrera with respect to this claim is *Dunn v. United States,* 442 U.S. 100, 99 S.Ct. 2190 (1979).  This case, however, is inapposite.  *Dunn* involves a defendant's right to answer to the charges in the indictment, and there is no allegation that Herrera was precluded from doing so.

Herrera asserts that the trial court told him at the beginning of the trial that he would be removed from the courtroom if he addressed the court in any way. Herrera provides no record citation for these alleged remarks, and the Director has found none. The record is clear, however, that during voir dire, Herrera attempted to disrupt his trial, was placed briefly in an observation room from which he could hear and see the proceedings in the courtroom, and was admonished by the court that he must cease from engaging in such behavior.

As an initial matter, it must be noted that Herrera did not move for a mistrial on the ground he now raises and, in fact, did not even make a formal objection to the procedure. *See United States v. Stotts,* 792 F.2d 1318, 1322 (5th Cir. 1986). The state habeas court found that Herrera had never objected to the procedure at trial or on direct appeal, and therefore this claim was procedurally barred. *Ex parte Herrera,* No. 71,171, Conclusion of Law 8 of Amended Order of 1/14/91. When a defendant fails to follow a procedural rule and review of that claim is refused by state courts, federal habeas review of the claim is barred, unless he can demonstrate both cause for his failure and actual prejudice resulting therefrom. *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 1572 (1982). Herrera demonstrates neither, and therefore review of this claim is barred.

Assuming *arguendo* that this Court may consider Herrera's claim, it is meritless. During voir dire, while a prospective juror was in the courtroom, the following exchange occurred:

> THE DEFENDANT: I do not consider this a trial. I consider it a lynching party. That's the way I feel.
>
> THE COURT: Mr. Herrera, you can either sit there and listen to the trial or we'll put in a cell and you can watch your trial on television, but <u>you will not disrupt the trial.</u>

THE DEFENDANT: I already have.

THE COURT: For the present, we're going to have you moved back into the observation room and you can stay back there and you'll see and hear the entire proceedings.

(SR X 61.) After Herrera had been removed from the courtroom, the trial court noted for the record that he had been taken into a special glass enclosed booth which gave him a full view of the courtroom and had a speaker system through which he could hear all of the proceedings as they occurred in the courtroom. *Id.* The trial court further noted:

> If the defendant at any time desires to consult with his attorney, he will be allowed to do so freely. If his attorney desires to communicate with him at any time, he will be allowed to do so freely. If the defendant at any time decides he wishes to return to the courtroom, that is, to the inside courtroom, he will be allowed to do so.
>
> . . . [Herrera] is actually in one corner of the courtroom which has a wall around it and a glass opening to allow him to watch all of our proceedings and to hear all of the proceedings. . . . [H]e is actually, in effect, within the courtroom but simply walled off so that he cannot disturb the proceedings.

(SR X 61-62.) Following a recess in the proceedings, Herrera was brought into the main part of the courtroom and the trial judge again admonished him that, in order to remain in the courtroom, he must conduct himself appropriately. The trial judge said:

> Mr. Herrera, you have heard the statements made, and I'm going to proceed. If you disrupt the proceedings, you will be taken to the glass enclosed booth and kept there where you can see and hear the proceedings but cannot disrupt them. It is much to your interests to be

at the table with your lawyers where you can consult
and they can consult with you, but I will not allow my
court to be disrupted and if you attempt to stand or
speak you will be removed immediately to the booth
and kept there.

(SR X 67). Thereafter, Herrera indicated that he understood these conditions. *Id.*

Thus, Herrera was sent out of the courtroom only after he had disrupted the proceedings in the presence of a juror -- and after he had acknowledged that he had done so. There is no allegation that Herrera, either before or after these admonitions from the trial judge, was precluded from speaking to the court through counsel. The only legitimate question raised by Herrera's contention therefore is whether the trial court has the power to insist that a defendant refrain from disrupting the courtroom and speak to the court only through his attorney.

The Supreme Court has noted that "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1061 (1970). Consequently, "[t]he flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." *Id.* Therefore, "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances in each case." *Id. See United States v. Weeks*, 919 F.2d 248, 250 (5th Cir.), *cert. denied,* ___ U.S. ___, 111 S.Ct. 1430 (1991) (defendant's rights must be balanced against the judge's obligation to protect the court and its processes, and this balancing of competing interests is entrusted to the sound discretion of the trial court); *United States v. Nicholson*, 846 F.2d 277, 279 (5th Cir. 1988) (same); *United States v. Theriault*, 531 F.2d 281, 284 (5th Cir 1976) (same), *cert. denied,* 429 U.S. 898, 97 S.Ct. 262 (1977).

The trial court's actions in Herrera's case were entirely appropriate. By his own acknowledgement, Herrera had disrupted the proceedings (SR X 61). His removal from the courtroom thereafter did not violate any constitutional rights. *Illinois v. Allen*, 397 U.S. at 343, 90 S.Ct. at 1060-1061. Communications between Herrera and his attorneys were in no way restricted by this action (SR X 61-62). He was informed that he could return to counsel table as soon as he was willing to conduct himself consistently with courtroom decorum (SR X 62), and he in fact did so (SR X 66-67). *See Illinois v. Allen*. 397 U.S. at 343, 90 S.Ct. at 1061. Accordingly, Herrera's claim is meritless.

WHEREFORE, PREMISES CONSIDERED, the Director respectfully requests that Herrera's petition for a federal writ of habeas corpus be denied, that a certificate of probable cause be denied, and that a stay of execution be denied.

Respectfully submitted,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY F. KELLER
Deputy Assistant Attorney General

MICHAEL P. HODGE
Assistant Attorney General
Chief, Enforcement Division

ANDREA L. MARCH
Assistant Attorney General

_Joan C Barton_
JOAN C. BARTON
Assistant Attorney General
State Bar No. 01855180

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080
Fax No. (512) 463-2084

## ATTORNEYS FOR RESPONDENT

### CERTIFICATE OF SERVICE

I, Joan C. Barton, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Respondent's Opposition to Request for Stay of Execution, Motion to Dismiss Pursuant to Rule 9(b), and Alternatively, Answer, Motion for Summary Judgment, and Supporting Brief** has been hand delivered on this the 16th day of February, 1992, to the Texas Resource Center, Austin, Texas, as authorized recipient for Mark Olive, Attorney for Herrera.

_Joan C Barton_
JOAN C. BARTON
Assistant Attorney General

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| *LEONEL TORRES HERRERA,* | § | |
| *Petitioner* | § | |
| | § | |
| *v.* | § | Civil Action No. _____ |
| | § | |
| JAMES A. COLLINS, DIRECTOR | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, INSTITUTIONAL DIVISION, | § | |
| *Respondent* | § | |

## O R D E R

Be it remembered that on this _____ day of February, 1992, came on to be heard Respondent's Opposition to Request for Stay of Execution, Motion to Dismiss pursuant to Rule 9(b), and, Alternatively, Motion for Summary Judgment and Supporting Brief, and the Court after considering the pleadings of the parties filed herein, is of the opinion that the motion is well taken and the following order should issue:

It is hereby ORDERED, ADJUDGED, and DECREED that Respondent's motion to dismiss for abuse of the writ be, and it is hereby GRANTED, that a Certificate of Probable Cause to appeal is DENIED and that a stay of execution is DENIED.

SIGNED on this the _____ day of February, 1990, at McAllen, Texas.

_____
UNITED STATES DISTRICT JUDGE